Our first case is number 2313648, United States v. Ricard et al. Looks like I have Mr. Cohen up first. May it please the Court, Judge Pryor, Judge Luck, Judge Brasher, good morning. I am going to take my arguments a little bit out of order because I've got four minutes and eight issues. So I may rely on my brief for some of the ones I don't get to, judges. So the first issue that I'd like to raise was issue 4 of the brief, the rule of completeness issue. What I asserted there was that the Court erred by failing to permit counsel for Ricard to introduce his client's complete pre-arrest statement after the government read part of that statement to the jury in violation of the rule of completeness. If you look at page 35 of the government's brief, they introduced approximately a five-minute excerpt of Ricard's statement, which was introduced to show that he admitted, one, taking the photograph of the witness Webster and the children, which was sent along with a ransom demand to their father. And secondly, the excerpt that the government introduced related to attempting to access Ms. Ha's bank account, referred to Ms. Ha as the scammer in the case, information through her phone. When the counsel for Ricard later asked the Court to permit him to introduce the entire statement, the Court rejected that proposal. On page 35 of the- Did Mr. Ricard ever request to submit that the Court enter less than the entire interview? He did, as I recall, from the transcript, but the Court denied that also, as I recall. In Ricard's brief, if you look on page 35, he says that my brief cites no language from the rest of the interview and makes no attempt to explain how the entire interview was necessary to explain the short excerpt played by the government relating to the ransom demand and the attempt to access Ha's bank account. But the government, I think, overlooked the fact that- or I should say the government's view of this was too narrow. If you look at Ricard's motion in limine, which is filed on June 28, 2023, page 67, you'll see a whole list of things. It's very important that I put in my appendix, in my record excerpt, which Ricard would have testified about regarding the rule of completeness. That the victim forced him, Mr. Guillen, out of $1.3 million and other matters in that. And I have a limited time, which shows that the government's view of the rule of completeness was too narrow. In short, the whole case turned on the issue of whether Ricard was there to collect the debt or whether he had committed a kidnapping. And the court's decision here, limiting that statement, limiting what I have in my appendix, which I draw your attention to, was not harmless. It was very significant. And as a result, the jury was never able to focus on the defense. And that was also raised in Issue 7 of my brief concerning the theory of defense instruction. I relied on a case, United States v. Lively. And if you look on page 3 of that decision, in United States v. Lively, you'll see that the court there says, if there's any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility, you have to give that instruction. I admit the instruction given by counsel for Ricard was wide-ranging, but the evidence that supported it was on Volume 6, Transcript 32, where the individuals in the car are talking to the victims and say, Your boss is a bad woman. She stole money from us. And so there's record support for that instruction. The insufficiency of the evidence issue, which was also raised by me in Issue 8, I agree with the government's position that the concurrent sentence doctrine, in fact, limits the argument, but not regarding placing Mr. Ricard under surveillance, which I say didn't take place until after the surveillance was complete, therefore the evidence was insufficient. So that part of my brief I am relying on with regard to the sufficiency of the evidence. We say the surveillance was complete on the prior day, prior to the kidnapping, and therefore the evidence was insufficient to convict him of Count 6. I'll rely on the rest of my brief since I have limited time for the other issues, but I think those were the most significant issues and worthy of reversal. Also, the sleeping juror issue, I cite the Fajardo case regarding that, which says that's obvious, you remove a juror in a case like that. The court and the attorneys disagreed on whether the juror was sleeping. The court, Judge Martinez, should have at least considered that with regard to speaking to the juror in a hearing to see if, in fact, he had been sleeping. I'll rely on my brief for the rest of this, Your Honors. Thank you very much. Thank you. May it please the Court. Good morning, Your Honors. My name is Mauricio De Sala. I am the CJA Appointment Counsel for Liu Duhong. I will only be arguing the first issue of my brief, which is the insufficiency of the evidence and the denial of the Rule 29 motion. The key element that I believe the evidence failed to show, or actually the government failed to show in the trial, was that Ms. Hung willfully kidnapped anybody, and those are three of the four counts that she was convicted on. Willfully because Ms. Hung, as the evidence showed in trial, had actually, other than her husband, who is the co-defendant, Mr. Byrd, had never met the other people she had spoken with, the so-called fraudster victim, Ms. Ha, through Facebook, if that's speaking, but actually didn't know anybody else involved in this. As the evidence showed, she also was only interested in getting her money back, and she had already done an effort in doing that, along with her husband, when Ms. Ha and her husband were in Ohio, and they actually signed over a promissory note for the $100,000 that they had given to Ms. Ha, and she had never returned. I believe she made a couple of payments on that promissory note. Later, Ms. Ha and her husband absconded Ohio, and they ended up in Miami. When they found out that they were in Miami, Ms. Hung and her husband came to Miami just to get that money back. That was the only willful intent that she ever had. She never had any willful intent to kidnap anybody, and the evidence failed to show that. Now, the government's brief relies heavily, and the trial counsel, on the aiding and abetting, but the aiding and abetting instruction, as given by Judge Martinez, also requires a defendant intentionally joins the person to commit the crime. The first time that she even knew that these things were going to go on, in other words, that they went to the fraudster victim's house, was when she was already on the way there. As the evidence clearly shows, she did not force herself into the house. When the second point, where they were at the Domino's Pizza, and some of the other defendants went into the Domino's, she stayed in the car. She didn't do anything except sit in the car. Although trial counsel, I did not try the case, trial counsel argued a matter of mere presence, perhaps mere presence wasn't the correct, but certainly there was no evidence that she willfully, which would have been the first element required of the three kidnapping counts she was convicted on. So we ask the court to vacate those counts. Thank you. Good morning. I may please the court. Margaret Fuldis, Assistant Federal Public Defender, on behalf of Christopher Baird. Mr. Baird challenges his convictions for a violation of his Fifth and Sixth Amendment right to present a defense. He was completely barred from bringing the duress defense. He could not argue it legally, and he could not present evidence on behalf of it. He also was denied the right to effectively bring a mere presence defense. Although he got a jury instruction on mere presence, he was precluded from bringing his most compelling evidence. I just wanted to clarify. Can you, that last part, where are you getting that last part, that he was precluded from allowing the introduction of evidence in support of the mere presence defense? Your Honor, the counsel was asked to give a proffer of the evidence, and that was on Docket Entry 364 at pages 45 to 47. There, the counsel was asked to give a skeletal summary of the evidence, and at the very end of that proffer, the court denied entirely the duress defense, but also the evidence that had been proffered. Can you show me, like, what's the best part that says, you can't present this evidence at all in this trial in support of your mere presence defense? There was never a statement like that, but what he did, what the court did do, is he denied it, like, just very broadly, and so for the counsel to try to then present the evidence that had just been struck, I think would not have gone well for him. But some of that evidence was, in fact, presented. The videos were already in evidence, but what, in the defense case, as you know, they ended up presenting the Ohio agreement, which was new evidence that was, in fact, part of the proffer. But some of the most critical evidence that was there, like, just their state of mind, that kind of thing, that was totally out. And for him to then – They said they weren't going to testify, but they clearly could have testified. There was a colloquy, as there generally is, and they asked, do you wish to testify that you're right? And they said, no, we don't wish to testify. The state of mind would have had to have come from them. Well, I think that the colloquy doesn't really matter that much in the sense that they knew that their defense had been denied, and like I said, for a lawyer who had just gone through the proffer with the judge, and they understood that he had just struck all that evidence, for him to then try to stand up and then present that same evidence for some other reason, you know, I think at that point it would not have gone well because – The court was in that same – I've read all of that part of the transcript. But what the court says immediately after that is, but you can present the mere presence defense, and I'm going to allow you to do that and instruct the jury of that. And in fact, he did present evidence that was in the proffer. He did argue it to the jury, and he was given an instruction. I believe that the lawyer was trying to abide by the rulings as he understood them. And he was very good at it. He didn't try to slip anything in there. He was trying to abide by what the judge had done. But I would like to focus back onto the duress for the rest of the argument. I did want to just clarify because I think my briefs were a little bit unclear. You know, the de novo standard governs the constitutional issues, obviously. And then as far as just the jury instruction itself on duress, that's an abuse of discretion. And the main point I just want to make about the duress defense is that the threshold to get a duress defense is very low. And that's of necessity because the role and the proper functioning of the jury have to be protected. That's what the Fifth and Sixth Amendment are there for. And that is the low threshold. It was the one that is described in the Bailey case there. You know, it talks about a minimum standard, and it's based on the version of the facts according to the defendant. And that is also reflected. Didn't your client at least recklessly put himself into that situation? No, Your Honor. He came down to just help his wife collect a debt. They had previous history, as was explained by a previous counsel, previous history of being able to just go to this person and say, Hey, look, you owe us the money. She signed promissory notes before. She made payments before. So there was no reason to think that they were going to be entering to this. This was a complete surprise to them. I guess that argument seems to go more to the mere presence issue. Duress is the idea that someone else is compelling you to do this. I am concerned about not giving this instruction, but it does seem like all of the arguments here really are more of a mere presence than a duress. Can you explain, like, how this is a duress case and not just a we showed up to do something? Yeah. I'll go straight to the proffer of what the counsel gave to the court to support his duress defense. And basically he proffered that, you know, they had this original intent to just get a new promissory note. But when they were there, they were surprised that Mr. Ricard took over the whole situation. There was actually an explicit and direct threat that if anybody called the police that there would be dead bodies. There was also the separation by Mr. Ricard of my client and his wife. They came in the same car like a normal couple would, and they were not permitted to leave. She had to go with Mr. Ricard, and they told Mr. Baird to drive his own car. In addition to that, there was just this continuing threat throughout because they were constantly separated. There was never a moment where either one of them was completely out of the control of either Ricard or Trang. And so if any one of them made a move to spook like Ricard or Trang, that was always putting the other one at risk because they just never had that moment where they were completely out of their control. And also with respect to the there was a government exhibit 21, which is a video, which corroborates the separation, like Ricard separating them kind of. And so that was part of the proffer, that the defense wanted to have the defendants testify about what was on that video and the state of mind that they had while the events were unfolding. Can I ask you a question about that? I mean, I understand your point about that, but it seems like all of that argument is really an argument that they were just there while someone else was kidnapping these people. It's not really an argument that I kidnapped them, but I did it because someone was making me do it. You see what I'm saying? Like all of that's like, well, look, I was in one car. My wife was in another. I really couldn't do anything. I mean, I didn't intend to kidnap these people. I was just kind of there. And then Ricard took over and sort of like organized this whole thing. Is it really the kind of thing where you're saying, you know what? You're right. I did kidnap them, but it was because someone else made me do it. I think that the threats and the environment that was there with the armed guards and the threats and the continuing threat over the time forms a duress defense because they would have just gone away if they could have, but they couldn't because they felt like they were threatened. So they felt like they had to be there. I have questions for the government on this, too. I think this is like the hardest issue in this case. But if this is a duress defense, then wouldn't you have a duress instruction like every drug deal, right? So like you've got two or more drug dealers, and one of them is probably both armed, but one of them is certainly going to be armed. And then the other drug dealer says, look, it was duress. I was there, and the other drug dealer was armed, and I didn't really want to do it. And the only reason I went through with it is because of the other drug dealer. And like are we creating sort of a everybody gets a duress defense as long as there's more than one person at the crime scene? No, I think that under the standards, the defense has to come forward with at least some minimal evidence to meet the elements of the duress defense. And I think that they did it through their proffer. And so, you know, but I think that there is a huge problem because the threshold is pretty low, and that's because the Fifth and Sixth Amendment are there that allow the defendant to bring a defense. And so those concerns cause that threshold to be very low. But the evidence that they wanted to introduce and they couldn't introduce, you say, it would be the testimony of the defendant. That's correct. Yeah, if you look at the proffer, it's pretty clear that the stuff that the counsel was proffering could only come from those defendants because it explains what was going on, where they were, and what their state of mind was. I am out of time, and so I thank you, Your Honor. Good morning, Your Honor, Your Honors. Bertha Mitrani, Assistant United States Attorney, on behalf of the United States. I'd like to start off where counsel ended with a duress instruction. Your Honor, in this case, there was no error in failing to give the duress instruction. As counsel correctly stated, the threshold for giving the instruction is low, but it's not nonexistent. There still has to be a minimum showing as to each and every element. In fact, the Supreme Court in Bailey's case precluded a defense instruction because the proffer given in that case wasn't sufficient to uphold each and every element of the duress defense. In this instance, the district court was playing its usual gatekeeping function in trying to evaluate whether the proffer was sufficient to meet all three elements. Let me begin with the proffer for just a minute because there was three things that counsel proffered. One, that allegedly showed duress. One, that Rickard, not Trang, that Rickard made the statement that if the police call, there'll be dead bodies. Is that clear from the statement? Excuse me? Is that clear from the proffer? Yes. Can you show me where it says, or they say, Rickard made the statement, if the police are called, there will be dead bodies? I believe that was my understanding. That may be the implication of what is said, but I'm just not sure that they ever indicate or that, I think it's Mr. Laird who gives the proffer, that Mr. Laird ever specifically indicated. Here's the relevant part. It's at page 45 of the transcript that we're talking about. The paragraph starts, when they were leaving the home, my client and his client was, his client was Mr. Baird. My client and his wife were attempting to get into my client's rental car. Instead, Mr. Rickard grabbed my female client by the arm, because he represented both, and pulled her away and forced her into the white car. From that point forward, she became a hostage. There was a threat made. If the police are called, there will be dead bodies. The passive voices seems pretty specifically used there. Now, it's clear that Mr. Rickard is the one who directed in the video. That's the first part you're talking about. Yes, sir. I'm not sure that that is exactly that it's Mr. Rickard making the threat. I'm not sure it's clear anyone who made the threat. It could be Connor Hightower. Who knows? Yes, the record is completely devoid of any evidence of who made the threat. I think the implication was that it was Rickard, because Trang testified that nobody had threatened anybody. Now, again, they can contend that it was Trang who said it, and that she was lying. It may not matter. It just seems that there's this threat, and it's unclear where it's tethered to. How does that play into the analysis of whether this minimum threshold is there? I guess that's really my question. So, the first prong is there has to be immediate harm, and the immediate harm has to last throughout the whole duration of the event. There's no indication that when this threat was met, I think they were implying that the coercion happened when they left the residence. But there were so many instances then afterwards. For example, Hong wasn't in Rickard's presence after the dominoes. Hong was in a car with Trang and with the nanny and with the two kids. She wasn't in Rickard's presence if that's where the threat came from, but I understand the court's point that perhaps it was Trang's. It's completely devoid, and I think that's one of the things that the court was struggling with. Does it matter that the threat is conditional? I would say that then it's, I think it does matter in the sense of, excuse me, if the police are called, there will be dead bodies. It's unclear as to who's even addressing it, if in fact it was even addressing it. Does a duress defense require that police be contacted? Yes, there's a case that says United States v. Lee at 694 F. Second 649 says that you're not entitled to a duress defense if there was a reasonable opportunity to inform the police. Or the third element is contact the police or what? Or extricate yourself or leave. Or escape, right?  There's no requirement to call the police to assert a duress defense, right? Correct. So if the condition is if you call the police, there will be dead bodies, and there's certainly no requirement that you call the police to get yourself out of the situation, then how can we say that that's an immediate or imminent threat throughout the course of this entire thing if there's a necessary condition for which you don't need to actually do? Right, and that's the government's position, that they could have either called the police or they could have escaped. They could have left the situation. And that wouldn't have triggered the condition of the threat, right? Correct. But isn't that where the splitting of the couple is relevant, right? If I understand correctly, the argument from the defendant is, look, they kidnapped the nanny and the kids, and then this couple is split up where one is in one car, the other is in another car. And so there's really no opportunity to extricate yourself from the situation because you would be leaving your spouse sort of at the mercy of these other people. So first of all, kind of separating them. I mean, there were 10 people involved in this. There were three cars. There necessarily had to be a separation of people for everybody to fit into all the three cars, I think. Yeah, but this couple was split up, right, in the same car? Well, you know, I think the evidence doesn't show that there was actually a deliberate separation. But even if there was, for example, when they get to the dominoes, and this is all in the video, when they get to the dominoes, where Ricard and the two in Hightower and Kahn go in, Bard goes in later. He is not with them. In fact, Bard is by himself in his own car. Hahn is in the car with the nanny and the two kids. At that point, they're certainly away from Ricard, away from the armed gunmen. There was certainly an opportunity for them to escape right there and then, both of them together. And likewise, after the dominoes, again, Hahn is never in the presence of Ricard. She's with Trang. She's with the nanny. They go to various places. They go to the strip club. Then they go to the quick stop, and then they drive around. There are opportunities for her to escape, but she doesn't avail herself of those. Why wasn't the right way to, and I might just be missing something, but why wasn't the right way for the district court to handle this is to say, look, I've watched the videos. I think this is a really weak defense. But if the defendant wants to take the stand and say that, look, the only reason I went along with this is because of this threat that was made and I was in fear for my life the entire time and that's why I did it, that that's enough to go to the jury on duress. Why isn't that the right answer? Because in its gatekeeping function, the court had to assess their proffer, assess what they're saying. And that's what they said that they wanted to say, though, right? I mean, I would say the inferences, they say they were going to say that, but again, in the proffer, he never indicated where this evidence was going to come from. He didn't indicate that his clients were going to take the stand and testify to that. It was just three things that a threat was made and the two pieces of the two videos, one outside the house and one at the dominoes, shows that they were allegedly being kidnapped or being held against their will. When was this issue resolved during the course of the trial? Yes, Your Honor, the issue was resolved at the close of the government's case. Right, right. So, I mean, I guess it's, isn't it, yeah, I mean, I get your point, but it just seemed, what they're saying is at the close of the government's case, they're saying, we want to present evidence of this arrest offense and so we want to know if we can get the defense in before we present the evidence. And it's, I mean, by necessary implication, they're going to present the evidence. I guess I see your point that they didn't say in their proffer specifically the defendants will testify to this. That's what you're saying? Yes, Your Honor, they didn't say that. And they didn't, I mean, well, they don't have to give a detailed, every single piece of evidence that they plan to introduce to support this. You have to say something. And it was just so vague, the statement, that if the police are called, there will be dead bodies. That doesn't mean anything. Had that come into the trial at that point? So that never really came, that didn't come in, right? Not at all, Your Honor. No one was cross-examined on that statement. Trang wasn't cross-examined on that statement. Nobody was cross-examined on that statement. And as I indicated, Trang, to the contrary, Trang had indicated that she or nobody had threatened anybody. Does the proffer say who the threat was made to? No. It doesn't say who it's from, and it doesn't say who it's directed at, right? Correct. Does it indicate whose dead bodies there will be? No. It could be the victim's dead bodies. Well, presumably, if there's going to be a threat about police being called, it would be the people who are being kidnapped. It would be the nanny or Ha. I understand the jury acquitted them of kidnapping Ha, but that would be the natural people to call the police, not all these partners in crimes. It's just so vague and so out there, to use a colloquial term, it just didn't meet that minimum standards that the Supreme Court indicated in Bailey to get this. Can you answer another question for me? So am I correct that Ricard is the one who objected to the jury?  Okay. What was the government's position when Ricard objected? The government agreed with Ricard that there wasn't sufficient proffer to meet all three elements of the test. Right, and so Ricard was saying, I mean, I guess this goes on, I mean, I don't think the district court, well, I don't know, this goes to sort of the severance issue, right? I mean, you've got one defendant saying, I don't want an instruction that sort of implicitly blames me for the whole thing, right? And the district court has to figure, is there any, does that factor at all into the abuse of discretion analysis here? I think inconsistent or opposite defenses can be dealt with, and, you know, the court didn't see that this rose to the level of requiring a severance. Perhaps if, I mean, this is speculation, right? But perhaps if that proffer was a more substantial proffer and actually met all three prongs, and you get past that they put themselves in this situation, which is sort of another hurdle that they had to overcome, which they didn't, you overcome the three elements of the duress defense, and that, perhaps at that point, the court could have severed and there was talk, a proposal to do that, but the judge didn't have to reach that issue. Can I ask you, this is my last question on this, because one sort of just kind of theoretical issue I'm having with this is, like, is the thing that they are trying to say an actual duress defense, in the sense the way I understand a duress defense is, yes, I committed the crime, right? I robbed the liquor store, I, you know, kidnapped the whatever, and I did it because someone was threatening me, and that's why I had to do it. It seems like throughout, though, what they're really arguing is just we went along with what was happening. We didn't intend to do any of this. It doesn't seem like it's really a duress defense. What do you say about that? I agree, Your Honor. I mean, I agree. That was sort of the tenor of the proffer. That was the tenor of the trial through cross-examinations, through everything, and that's why Judge Martinez allowed them to present a mere presence defense, and they weren't precluded from admitting anything to support that. The only piece of evidence, if you will, that Judge Martinez precluded them was that statement to the extent that went to duress. If the police are called, there will be dead bodies. Other than that... In other words, what we're talking about here is the difference between, and I think by using the term defense, we're sort of mixing it, but mere presence really isn't a defense. It's a negation of an element. I did not willfully do something. I think one of your opposing counsel I think articulated that very well. It's not a defense. It's not as, I did the crime, but... But a true affirmative defense is, I did the crime, but... Self-defense is one of those things. I did the crime, but I was doing it because I had to protect myself from bodily harm. Duress is, I did the crime, I met all the elements, but I did it because there was a gun to my head while I was doing it. That's the difference we're talking about here, and is it based on the record that we have before and based on the proffer, was this an affirmative defense of, I admit that I did everything here, but I did it because there was a gun to my head, or was this a case of, I am negating an element of the crime. I did not willfully commit this crime. Which one is it? I think at trial, they wanted both. They submitted both proposals, and Your Honor is 100% correct. They're actually opposed to each other. The duress, in essence, admits the crime. I did it, but I was forced to because we'd be killed. Mere presence is, we were just there, we didn't know that Ricard was going to do this. So they were opposing, really they canceled each other out in so many ways. I think Judge Martinez weighing all the trial testimony, all the evidence felt that this made a decision, that this was a mere presence situation and not a duress situation. Your Honor, Judge Pryor, you asked a question about the rule completeness, about the transcript, whether there's ever... When Judge Martinez said that there was, they could not introduce the whole transcript, they did propose to do about the first 15 minutes of the transcript, which was 45 minutes before the portion that the government introduced. However, that really had to do with their defense that Ha was a scammer, and they were here to get their money. All evidence that they got out, they clearly got out through cross-examination and made in their closing, so that there was... It was not putting the other part in context. Correct. It was really, it was their defense. It was their defense. Yes, Your Honor, I just wanted to address the court's question. I see my time is up. If there are no other questions, thank you. We would ask that you affirm the convictions and the sentence in this case. Good morning again, Your Honors. When there's so much to say, it's little time to say it. I hope you'll forgive me for this. In any event, the rule of completeness, what was very important is, I think that the court looked at this too narrowly. You're talking about a ransom demand and an attempt to access Ha's bank account. That's what the government did. Four-plus-minute playback was concerned with. We're saying the whole statement should have been permitted to be introduced, or the portion of it that, again, Judge Martinez said no about, because it was important that the defense that was raised by Mr. Ricard be presented to the jury in a way they understood. That is, that Ha was a scammer and that, in fact, Ricard was there to collect the debt, not to kidnap, necessarily. How is that a negation of the intent to kidnap, right? Like, if you're going to kidnap to collect the debt... Well, the point is he was there to help facilitate what Ha had already agreed to do, Judge. Ha had already agreed to pay back the money, and that's what they were trying to show. And that's why, if you look at my appendix, you'll see all of the things that would have come out which would have been appropriate. And that also ties in to the theory of defense instruction, because if there's any evidence at all to support it, it should have been given. In this case, Judge Martinez precluded the admission of a letter from Ha's purse, which would have shown that they were there to essentially fulfill the agreement that Ha had made to return the money. That was precluded. That would have been part of the jury instruction. In any event, the jury instruction could have been tailored by Judge Martinez based on the heart of the defense. It goes to the rule of completeness as well as the instruction itself. That was the whole heart of the defendant's case. And by making the errors we say he made involving the issue of the rule of completeness, involving the theory of defense instruction, we think the case should have been reversed. The only other issue I wanted to raise, Judge, was Issue 6, which dealt with Judge Martinez's striking of the witness initially, Ms. Trang, who took the stand and testified. You're now going far afield of what you argued initially, and we've given you some extra time. I appreciate that, Judge. I'll rely on my brief for that. Thank you very much. Thank you, Your Honors. Thank you, Your Honors. By way of rebuttal, the first element, the willful element, which is, I think, the key one as regards to Ms. Hung in this case, was, I think, clearly absent in many stages of the trial. For example, when they went to their house, there was no, at that point, no indication that she was the one that was running any type of kidnapping. And it was the nanny who actually said, I can't leave. I don't know the address of Ha, which who Hung was looking for Ha to get her money back. I don't know the address, but she works at a pizza place. And then another co-defendant said, well, you're going to show us where it is. And then that's when the nanny said, I can't leave the kids here. So it was actually the nanny that actually started that, not that obviously the nanny is in any way responsible for the kidnapping, but it shows that Ms. Hung was really not even remotely involved in what the actual element of the kidnapping was concerned. Similarly, at the pizza hut, it was also a situation where she was outside in the car. She never went in, never tried to intimidate, harass, or intend to kidnap anybody at the pizza hut, per the evidence. And hence, that's the reason I think that Ms. Hung did not, Ms. Hung's case did not willfully, the element of willfully was not present in her, in the case that as to her three convictions for the kidnappings. Thank you, Aaron. I'm going to try to talk as fast as I can. It's hard to argue that a mere presence fits this case really, just because this thing happened over about eight hours. And it's real hard to say that you were merely present for something that was going on for eight hours. You're seeing what's going on in front of your face. You want to leave, but you can't, because you're afraid that you're going to be harmed. I mean, that is a duress case, and it's backed up by the proffer with all the different threats. And especially, I just wanted to call the court's attention the continuing threat that happened all day, because neither one of my client or his wife were solely out of the control of either Trang or Ricard. Either one, they were both agents of each other. I also wanted to just address real quickly the severance issue. I think it did have some relevance, because I think the court felt a little constrained to not let my client present his duress defense, because I think he had a bigger problem on his hand with Ricard, because they would then be diametrically opposed. And I also just wanted to call to the court's attention a couple parts of the record that I think are critical to look at. One is on docket entry 392, page 43. It's when the court reaffirmed its duress ruling. Mr. Lehrer had said, I want to make sure that not being allowed to testify about or to bring in testimony of duress, I want to make sure that that is preserved so that not calling an additional witness will not waive that. And the court said, no, as far as I'm concerned, you have preserved your issue by tendering the fact that you intended to do it, and I told you you can't. So, again, I think the lawyer was just trying to abide by the ruling of the court. The other one is the Government Exhibit 21, which is the video that does corroborate that they were being separated, that they weren't able to come together and just be normal as a couple like you would expect. If you look at that video, the other thing it does show is there was no time in that parking lot that they could just run off together. It shows also, so Hong, my client's wife, was in this white car with the nanny of the kids while everybody else was in Domino's Pizza. And the armed guards, though, were at the white car. And you can see it in that video because there's like this black shadow on the white car. And then you see that shadow get up and move when other people are coming out of Domino's Pizza. So it shows that she was being guarded in that white car, that she didn't come out of that car until that guard was gone. And then when she tried to go, there was a minute, a span of five seconds, literally, she's trying to reproach her husband. Her husband's unaware of that because he's looking in a different direction. And then Ricard and Trang are coming back. And Ricard brings his hand around her. He stands right in front of her. And then he turns around and ushers her over to the white car again. So he's not letting her get to her husband. So that's Government Exhibit 21. And I checked with the clerk. It is accessible to you all through some sort of internal link you'll have. And then the last thing that I wanted to really say was the jury did pick up on the fact that there was division between the defendants because they acquitted on the conspiracy count. So they could see that there was not an agreement there. And I also just wanted to mention, too, that I had cited several cases that talk about this continuing threat theory for the third prong on the duress defense. It shows different cases where there's these continuing threats that go on for days, sometimes weeks, sometimes months. And it's because that continuing threat has not abated just like it did not abate in this case. We understand. Thank you very much. Thank you.